UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALI AL-TIMIMI,

                    Petitioner,                  Civil No. 05-10266

v.                                       Hon. David M. Lawson

                                        Magistrate Judge Charles E. Binder

ANDREW JACKSON,

                    Respondent.

_____/

### OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, OVERRULING PETITIONER'S OBJECTIONS IN PART, AND DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Ali Al-Timimi currently is confined in a Michigan prison serving a fifteen-to-twenty-five-year sentence for second-degree murder. Through counsel, he filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is unlawfully confined because his rights under the Confrontation Clause were violated during his jury trial in the Wayne County, Michigan circuit court. This matter was referred to Magistrate Judge Charles E. Binder, who issued a report on July 5, 2006 recommending that the petition be denied. The petitioner timely filed his objections to the Report and Recommendation, and this matter is now before the Court for *de novo* review.

The focus of the habeas petition is on the manner in which the state court dealt with the unusual circumstances surrounding the unavailability at trial of an important State witness. The witness, Zamen Al-Kasid ("Zamen"), was the petitioner's teenage sister-in-law and the apparent romantic interest of the murder victim, Waheed Al-Alyawi ("Waheed"). Waheed was killed when the motorcycle he was riding was struck by an automobile driven by the petitioner. The State's theory was that the petitioner intentionally caused this collision because the petitioner's family was

upset at the relationship between Zamen and Waheed.  Zamen provided crucial testimony at the preliminary examination establishing this motive, but she could not be located for trial.  The major complication arose when it was discovered that the magistrate's recording equipment malfunctioned, the court reporter had died, and only a few pages of Zamen's prior testimony were preserved.  The state trial judge permitted the prosecutor to call witnesses present during Zamen's testimony to repeat what she said at the preliminary examination.  Although the petitioner had the opportunity to cross-examine Zamen at the preliminary examination, he contends that the trial witnesses' account of Zamen's testimony did not do justice to the full range of questioning during the prior testimony, and his right to confront Zamen was violated.

The magistrate judge concluded in his report that the petitioner's claim lacked merit.  He applied the Supreme Court's watershed Confrontation Clause decision of *Crawford v. Washington*, 541 U.S. 36 (2004), which was handed down just a few weeks before the state court of appeals issued its opinion in the petitioner's direct appeal, and concluded that there was not much of a contest that Zamen was unavailable at trial, she gave prior statements under oath that properly are characterized as testimonial, and the witness was subject to cross-examination.  So he found that the petitioner's real challenge went to the manner in which the testimony was presented to the jury, which did not contravene any clearly establish Supreme Court precedent.  Therefore, the magistrate judge suggested, the petitioner was not entitled to a writ of habeas corpus.

The petitioner's objections challenge several factual determinations by the magistrate judge, which the petitioner believes are erroneous and lead to the incorrect conclusion about the fairness of the presentation of the secondary evidence of Zamen's prior testimony.  He also disagrees with the magistrate judge's ultimate conclusion that the petitioner was able to confront the witness

adequately within the meaning of the Sixth Amendment. After reviewing record, the magistrate judge's report, and the parties' submissions, the Court concludes that although the magistrate judge made some mistakes in his factual account, his ultimate conclusion is compelled by the rigid standard applied to habeas cases in the wake of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). The state courts' decision to permit secondary evidence of a State witness's prior testimony – where the petitioner had the opportunity to cross-examine the witness fully during the prior proceeding – was not "contrary to," nor did it "involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Therefore, the Court will deny the petition.

## I.

Because the petitioner takes issue with the facts as summarized by the magistrate judge, the Court will review the evidence in some detail. The traffic collision causing Waheed Al-Alyawi's death occurred on October 3, 2001, in Dearborn, Michigan. Waheed was riding a motorcycle when he was struck and killed by an automobile driven by the petitioner. The petitioner fled the scene, but his license-plate number was recorded by two eyewitnesses. When police located and questioned the petitioner, he initially denied having any knowledge of the accident. Eventually, he admitted that he was in an accident but claimed that he did not know Waheed, the victim. The police later learned of the romantic liaison between twenty-six-year-old Waheed and Zamen, the petitioner's sixteen-year-old sister-in-law, which ran counter to the family's wishes. The petitioner was charged with first-degree murder, and Zamen was taken into protective custody before the petitioner's preliminary examination, which was held on October 26, 2001 before the Honorable

Virginia Sobotka of the Nineteenth District Court for the City of Dearborn. Zamen escaped but was found prior to the hearing, where she testified under oath as a witness for the prosecution. The petitioner was bound over to circuit court on a charge of first-degree murder.

Zamen continued to be held in protective custody until she again escaped in December 2001. The police department became aware of the disappearance in March or April 2002 and began to search for her. They placed flyers along Seven Mile Road, and interviewed her family and friends, but were unable to find her. When the petitioner's trial commenced on October 7, 2002, Zamen could not be located. The trial court found that the prosecution had undertaken diligent efforts to locate her and declared her an unavailable witness.

In the meantime, it was discovered after the preliminary examination that the court reporter's equipment had malfunctioned during Zamen's testimony. Only five pages could be transcribed. In addition, the court reporter died and a transcript of the remainder of the hearing could not be produced. The transcript remnant from Zamen's testimony reads:

> Q: [state prosecutor]: Could you please tell us your name?
> A: Zamen Al-Kasid.
> Q: Do you know someone by the name of Ali Al-Timimi?
> A: Yes, I do.
> Q: Is he present in the courtroom today?
> A: Yes, he is.
> Q: Could you please tell us where he's seated and what he's wearing?
> A: He's sitting – you want me to point him out?
> [Q]: Yes.
> A: right over there wearing a blue shirt. I believe that has red stripes on it.
> [Prosecutor]: Let the record reflect that the witness has pointed to the defendant, Ali Al-Timimi and has described what he's wearing.
> Q: . . . Could you tell us how old you are, please?
> A: Sixteen years old.
> Q: Back in the month of October, even September of the year 2001, did you have a boyfriend?
> A: October what, 2001?
> Q: Yes; of this year.

A: Yes, I did.

Q: Would you tell us your boyfriend's name, please?

A: Waheed Alalyawi.

Q: Back in September of the year 2001 can you tell us where you were living?

A: In September?

Q: Yes.

A: At home.

Q: And where was your home?

A: On Steadman near Ford Road.

Q: While you were living at home on Steadman, were you living with your parents?

A: Yes, I was.

Q: Were you also living on Steadman with anybody else?

A: Yeah.

Q: Who else was living at your house on Steadman besides you and your parents?

A: Ali Al-Timimi and my sister.

Q: You said the defendant, Ali Al-Timimi was living with you as well as your sister?

A: Yes.

Q: Is the defendant, Ali Al-Timimi, somehow related to you?

A: He is my brother-in-law.

Q: He's married to your sister?

A: Yes.

Q: Which sister is that?

A: Nakla (phonetic).

Q: You said your sister and the defendant were living with you in the house on Steadman; is that correct?

A: Yes, because our house on Emmenon was burned and they used to live in the upstrairs [sic] house, because it was a two-story house.

Q: Okay. How long have they been living at your house with you and your parents?

A: I can't remember.

Q: Would it be more than a few months?

A: Yes.

Q: Would it be more than a year?

A: Probably.

Q: Okay. You said that you – you said that your boyfriend's name was Waheed. What was his last name?

A: Alalyawi

Q: His name was Waheed Alalyawi?

A: Right.

Q: Okay. Did there come a point in time when his family and your family became involved in at least some kind of an arrangement between the two of you?

A: Kind of.

Q: When you say kind of, can you tell us about that?

A: Well, when he came he sent his mother and his mother's friend to engage me.

Q: When you say engage me, what does that mean?

-5-

A: To ask for my hand.

Q: You mean to ask for your hand in marriage?

A: Yes.

Q: Okay.  When his mother came to your family who did she speak to?

A: My family.

Q: Yes, but who specifically in your family did she speak to?

A: My mother.

Q: Okay.  Did that result in an arrangement, a marriage arrangement between the mothers?

A: Yes.

Q: Okay.  During the time that this arrangement was going on, was that also during the time that the defendant was living with you and your family on Steadman?

A: Yes.

Q: Okay. And did something happen to this marriage agreement that caused it to fall apart?

A: Yeah.

Q: Okay.  And what was that?

A: They said no because he was bad; he used to drink and go out with girls.  That's what they told me.

Q: Okay. Who ultimately told you they weren't going to let the arranged marriage happen?

A: My mother and father.

Q: Okay.  Your mother and father told that you [sic] this arranged marriage was not going to happen.  Were you ever told not to see Waheed after that?

A: Yes, I was.

Q: Okay. And did you follow that?

A: No, I didn't.

Q: Okay. And what did you do after having been told not to have any contact with Waheed?

A: I kept in contact with him.

Q: Did there come a time when the defendant in this case, Ali Al-Timimi, prior to October 3, 2001 wanted to have a conversation with you regarding your relationship with Waheed?

A: Yes.

Q: Okay.  What can you tell us about that?

A: He had come to my school that day.

Q: Okay. Which date did he come to your school?

A: October 3rd.

Q: What school is that?

A: Fordson High School.

Q: And what happened when the defendant, Ali Al-Timimi, came to Fordson High School on October 3, 2001?

A: [nothing further written]

-6-

State Court Transcript of Proceedings held on 10/26/01, at 81-86.

After that testimony was read to the jury, the trial court permitted the parties to call witnesses who were in the courtroom during the preliminary examination to tell the trial jury what they remembered of Zamen's testimony. The first witness called for this purpose was Judge Sobotka herself, although she was not identified as a judge, but merely as a person who was in the courtroom during the preliminary examination. Judge Sobotka had taken two pages of notes during Zamen's testimony, two-thirds of which were from the direct examination and one-third from the cross-examination. She testified that the testimony was not very long, and that she took notes "[v]ery briefly" on the cross-examination. Tr., 10/9/02 at 63-64, 66.

Judge Sobotka referred to her notes as she testified. She told the jury that Zamen had testified that Zamen's sister's husband (the petitioner) had talked to her three times about her relationship with Waheed. During the second of these conversations, which occurred on the way to school, the petitioner had told her that "the marriage would be off and that she would be forbidden to see him" because "[h]e was bad and she would ruin the family." *Id.* at 59. The third conversation occurred on the day of the accident, and Judge Sobotka described Zamen's testimony as follows:

> A: She [Zamen] was using the cell phone talking to Waheed when her father discovered her. And he started beating her. She started screaming. The family came into her room.
> Q: When you say that she said he started beating her, who was she describing as he?
> A: Her father.
> Q: Her father was beating her.
> A: And at that time when she started screaming then the other members of the family came into her room.
> Q: Okay. Let me back up another second. Did [Zamen] testify about where she had gotten this cell phone that she was caught with?
> A: From Waheed.
> Q: Did she describe the purpose for why Waheed had given this cell phone?
> A: So that he could keep in touch with her.

Q: All right. After the family or after her father – she testified that her father found her talking on this cell phone and beat her, what did she describe happened next?
A: Her screaming brought the other members of the family into the room.
Q: What did she then describe happened?
A: After the other family members left, her brother-in-law [the petitioner] remained.
. . .
Q: Did she say what it was that Mr. Ali Al-Timimi said to her after he remained to talk to her?
A: It started out with that, you cannot marry him. He is bad. You will ruin the family. Then he said that he would take care of him. [H]e would kill him. [A]nd I Haider would kill her.
Q: Haider?
A: Her brother, Haider.
Q: All right. So specifically did she testify that the Defendant said that he would kill Waheed?
A: Yes.
Q: Did she say – Did she testify as to when he said he would do that?
A: He said today he would take care of him. He would kill him and Haider would take care of you and kill you.

*Id.* at 60-62.

Judge Sobotka testified that she wrote down twice exactly what Zamen testified was said by her brother: "'You'll see what I'll do to deceased. He won't be alive. Haider will kill you. . . . I will kill decease[d]. . . . Today you will see what I will do. I will kill. And your brother will kill you.'" *Id.* at 63.

The second witness to recount Zamen's preliminary examination testimony was Anne Kanitra, a detective with the Dearborn Police Department. She told the jury that Zamen had testified that Waheed was her boyfriend and that she was engaged to marry him, although her family disapproved. *Id.* at 73. Kanitra remembered Zamen testifying that the petitioner

had gone to her school and pulled her out of class, pulled her out of school and told her or asked her are you seeing Waheed, and she denied it to him, saying, no I'm not seeing him, although she was seeing him.

*Id.* at 74.

Kanitra said that Zamen recounted the following events that occurred  during her final contact with her brother-in-law on the day of Waheed's death:

> Q: And what did she say happened after Mr. Al-Timimi got her out of school that day?
> A: When they had went [sic] home to the house, she was on her cell phone talking to Waheed, and I believe her father walked in and caught her on the phone talking to him and became upset.
> Q: Did she say where it was that she got this cell phone?
> A: I believe it was from Waheed.  It was not from her family.  Waheed bought it for her.
> Q: And after her father discovered her on her cell phone, what did she say happened?
> A: He became very upset and I think struck her.
> Q: Did she say what happened after that?
> A She was kept in a room, in her room, made to stay in her room. And then Ali [Al-Timimi] came in.
> . . .
> He came in and told her that you better not see him, and if you – I'm going to kill Waheed and Haider, Haider is her brother. Is Zamen's brother. Will kill you.
> Q: Do you specifically remember Zamen Al-Kasid testifying under oath that Mr. Ali Al-Timimi told her that he was going to kill Waheed?
> A:  Yes.

*Id.* at 75-76.

Kanitra admitted on cross-examination that she did not take notes during the preliminary examination, and she was recalling Zamen's testimony strictly from memory.  She also stated that she did not remember which facts were brought out during the direct examination as opposed to those elicited on cross-examination.  She did not recall Zamen testifying that Waheed has told her that he was going to kill himself.

The final witness who related Zamen's preliminary examination testimony for the jury was Paul Keiper, also a detective with the Dearborn Police Department.  He testified without notes, from memory, and said:

> A: She testified that Ali Al-Timimi had gone to Fordson High School where she's a student.  He got permission to remove her from the school.  He took her home.  He

had discussed with her about the fact that she was not to see Waheed, because she was disgracing the family.

Q: Did she indicate what happened after Mr. Al-Timimi took her home?

A: Eventually she was in her room. And she had a cell phone that Waheed had given to her so that they could keep in touch with each other. She was talking with Waheed on the phone when her father came into the room. He caught her on the phone, took the phone away from her. He slapped her and that was it at that point in time.

. . .

Q: Did she indicate what happened after her father slapped her after finding the cell phone?

A: A short time later, Ali Al-Timimi came into the room. He was again upset with her over not listening to what the family had said and he told her that he was going to kill Waheed and that her brother Haider was going to kill her.

*Id.* at 91-93. The defense elected not to call any witnesses who were in the courtroom during the preliminary examination to testify as to their recollection of Zamen's testimony, and the defense claimed that no other person in the courtroom had a full recollection of the cross-examination testimony.

The prosecution also called other witnesses who described the relationships, as did the defense. One defense witness, Rafah Al-Kasid, testified that she brought Zamen clothing before the preliminary examination, and asked her about the incident. She testified that she asked Zamen

you going to be testifying today, you know that? she said, yes. And I said, are you going to say something about Ali, like he killed Waheed or anything else? And she said, Ali not killed Waheed. Waheed killed himself. And I said, what do you mean by that? And she said, Waheed told me that if I won't marry you I will kill myself. . . . and when I say what are you going to testify about? She said, what they want me to say.

Tr., 10/9/2002, at 116. She testified that Zamen told her that the officers were preventing her from contacting the family. Rafah testified that after the preliminary examination, Zamen said that she only testified that way because she was threatened with being put in a mental hospital or jail for fifteen years by a police officer.

-10-

Emad Al-Kasid, Zamen's brother, also testified for the defense.  He testified that the petitioner was not involved with disciplining Zamen, and it would be against the family's religious beliefs to have the petitioner alone with Zamen at any point.  Nahla Al-Kasid, the petitioner's wife, testified that she did not hear any fighting between Zamen and her father, and the petitioner did not enter Zamen's room because it would have been against their religious beliefs.  Ahmed Alkhalidi, a longtime friend of the petitioner, testified that the petitioner was at his house on October 3 from 2:00 or 2:15 in the afternoon until 5:30 or 6:00.

Each side called an accident reconstruction expert witness.  Gordon McIntosh, a corporal with the accident reconstruction division of the Dearborn Police Department, testifying for the prosecution, said that there were oil droplets on the road that, he believed, were from the motorcycle because they followed the gouge marks in the pavement.  The oil droplets were in a straight line, which was "inconsistent" with a motorcycle veering sharply. Tr., 10/8/2002, at 148.  McIntosh also testified that there were no skid marks, as would be expected if there was hard breaking.

Sammie Hall, a professional Traffic Accident Reconstructionist, testified for the defense that, based on the damage to both vehicles,

> the motorcyclist was eventually impacted from the rear.  But what happened, because the difference in speed was at or about ten miles per hour, that motorcycle made contact with the right side of the vehicle, continued in front of the car, and it is my assumption, it is my opinion, that the motorcyclist was out of control and once the vehicle is out of control, it's basically my opinion again, that he was decelerating.

Tr., 10/10/2002, at 24.  He also challenged Mr. McIntosh's conclusion regarding the oil spots, noting that the vehicle was probably traveling 35 miles per hour, or 51 feet per second, and it would "ha[ve] to be a rather distinctive or a steady stream of oil coming out."  *Id.* at 40.  He also noted that there was an oil-change establishment nearby that also could have contributed to the oil spots on the road.

-11-

At the conclusion of the five-day trial, the jury found the petitioner guilty of second-degree murder, and he was subsequently sentenced to fifteen to twenty-five years in prison.  On direct appeal, the petitioner raised his Sixth Amendment issue and argued that the attempt to reconstruct Zamen's preliminary examination testimony was "grossly incomplete" and "failed to include all of the substance of that witness testimony, including that given on cross-examination."  The court of appeals, applying *Crawford v. Washington*, rejected this argument.  The court noted:

> [D]efendant fails to demonstrate that the witnesses at issue lacked knowledge about Al-Kasid's testimony on cross-examination at the preliminary examination.  Our review of the witnesses' testimony reveals that these witnesses' recollections were not limited to only the direct examination portion of Al-Kasid's testimony.  Moreover, defendant had the opportunity to interview and present any other witnesses that may have been present during Al-Kasid's cross-examination.

*People v. Al-Timimi*, 2004 WL 1254271, at *3, (Mich. Ct. App. Jun. 8, 2004) (unpublished).  Over the dissent of two justices, the Supreme Court of Michigan denied leave to appeal on March 31, 2005.  *People v. Al-Timimi*, 472 Mich. 882, 693 N.W.2d 822 (Mar. 31, 2005 (table).

Thereafter, the petitioner filed a timely petition for a writ of habeas corpus in this Court, alleging a violation of his Sixth Amendment right to confront and cross-examine a witness because Zamen was not produced for trial and the secondary evidence of her prior testimony was inadequate to satisfy the Confrontation Clause.  The respondent filed an answer in opposition, and Judge Binder issued a report recommending that the petition be denied.

## II.

The petitioner objects to several of Judge Binder's factual findings, including a statement in the report that Judge Sabotka had taken six pages of notes during Zaman's testimony, an assertion that "the defense elected not to call any witnesses who were in the courtroom during the preliminary examination to testify as to their recollection of Zamen's testimony," R & R at 6, and Judge Binder's

-12-

deference to the factual determinations of the state court.  The petitioner also objects to Judge
Binder's substantive characterization as a "state law question," R & R at 16, the issue of the mode
in which an absent witness's prior statements are presented.  Finally, he takes issue with Judge
Binder's assertion that the petitioner cited only *dicta* in *California v. Green*, 399 U.S. 149 (1970)
for the proposition that the manner of presentation of an out-of-court statement can run afoul of the
Confrontation Clause.  The petitioner believes that *Crawford*, which he cited frequently, also stands
for this proposition, and he cited *Dutton v. Evans*, 400 U.S. 74 (1970), and *Mattox v. United States*,
156 U.S. 237 (1895), for this same proposition.

Objections to a report and recommendation are reviewed *de novo*.  28 U.S.C. § 636(b)(1).
The Sixth Circuit has stated that "[o]verly general objections do not satisfy the objection
requirement."  *Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006).  "The objections must be
clear enough to enable the district court to discern those issues that are dispositive and contentious."
*Miller v. Currie,* 50 F.3d 373, 380 (6th Cir. 1995).  "'[O]bjections disput[ing] the correctness of the
magistrate's recommendation but fail[ing] to specify the findings . . . believed [to be] in error' are
too general."  *Spencer*, 449 F.3d at 725 (quoting *Miller*, 50 F.3d at 380).

The petitioner is correct on one of his factual challenges, but this error does not necessarily
change the legal analysis.  The petitioner is correct that Judge Sobotka took only two pages of notes
on the testimony of the critical witness, not six pages as stated by the magistrate judge.  However,
the petitioner has not provided evidence to support his other factual challenges. For example, the
petitioner points to *arguments* made by his counsel in the trial court for the proposition that "not a
single person known to have been present claimed any knowledge of the substance of the cross-
examination testimony."  Petr.'s Obj. at 4 (citing Tr. 10/3/02, 14-15, 19-12).  But the *testimony* he

-13-

references is inconclusive on the point.  For instance, he points to Judge Sobotka's testimony that she took some notes on the petitioner's cross-examination, but did not record certain dates or times discussed during the examination.  However, the record indicates that about one-third of Judge Sobtka's notes related to the defense cross-examination.  Nonetheless, no one ever asked Judge Sobtka to separate the information she received on direct  examination from that revealed on cross-examination.  Judge Sobtka's trial testimony does not establish that the defense cross-examination could not have been explored at trial.  Detective Kanitra testified that she did not take any notes, and stated that she did not know whether the testimony she remembered was elicited on direct or cross-examination. Dearborn detective Paul Keiper was never even asked about the information he remembered from the direct as opposed to the cross-examination.  And trial counsel, who also was the cross-examiner at the preliminary examination, never suggested that the record was incomplete or made an offer of proof of cross-examination evidence that was omitted from the witness accounts. This showing does not establish that there were no witnesses that could describe Zamen's testimony on cross-examination.

Turning to the substantive objections, the petitioner disputes the magistrate judge's characterization of the passage from *California v. Green* relied upon as *dicta*, and he disagrees with the ultimate determination that using secondary evidence of an absent witness's prior testimony satisfies the Confrontation Clause.  Although the petitioner's arguments have some persuasive force, they do not carry the day.

The development of the rights preserved by the Confrontation Clause, chronicled to some extent in *Crawford*, 541 U.S. at 54-57, parallels (but does not duplicate) the evolution of the rule against hearsay.  As the source of proof in trials at common law evolved from the private knowledge

-14-

or results of investigation by jurors themselves to the testimony of witnesses in open court, a premium was placed on procedures intended to ensure the reliability of the evidence presented to disinterested fact finders. The reliability of a witness's testimony depends in large measure on the witness's ability to perceive, remember and relate events, and the witness's sincerity. *See* 2 *McCormick on Evidence*, § 245, p. 93 (5th ed. 1999).

> In order to encourage witnesses to put forth their best efforts and to expose inaccuracies that might be present with respect to any of the foregoing factors, the Anglo-American tradition evolved three conditions under which witnesses ordinarily are required to testify: oath, personal presence at trial, and cross-examination. The rule against hearsay is designed to insure compliance with these ideal conditions, and when one of them is absent, the hearsay objection becomes pertinent.

*Ibid.* (footnote omitted).

In hearsay jurisprudence, these testimonial guarantees historically have not been viewed as ends in themselves, but rather as means intended to achieve the ultimate goal: reliability of the evidence considered by disinterested fact finders. Thus, where there are functional substitutes for the testimonial guarantees which ensure reliability, rendering them "a work of supererogation," 5 J. Wigmore, *Evidence* § 1420, at 251 (J. Chadbourn rev. 1974), they are comfortably dispatched and exceptions to the rule against hearsay are recognized. *See, e.g. Idaho v. Wright*, 497 U.S. 805, 820 (1990) (explaining rationale behind excited utterance, dying declaration, and medical treatment hearsay exceptions).

The Confrontation Clause was intended to import these same protections assuring reliability into American criminal procedure. As the Supreme Court explained over a century ago:

> The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling

> him to stand face to face with the jury in order that they may look at him, and judge
> by his demeanor upon the stand and the manner in which he gives his testimony
> whether he is worthy of belief.

*Mattox v. United States*, 156 U.S. 237, 242-243 (1895).  The purpose of the Confrontation Clause,

then, was to "constitutionalize" the common-law testimonial guarantees by which an accused could

test a witness' perception, memory, ability to relate or communicate, and, perhaps most importantly,

his sincerity.

> Confrontation: (1) insures that the witness will give his statements under oath – thus
> impressing him with the seriousness of the matter and guarding against the lie by the
> possibility of a penalty for perjury; (2) forces the witness to submit to
> cross-examination, the "greatest legal engine ever invented for the discovery of
> truth" [Wigmore, § 1367]; (3) permits the jury that is to decide the defendant's fate
> to observe the demeanor of the witness in making his statement, thus aiding the jury
> in assessing his credibility.

*California v. Green*, 399 U.S. 149, 158 (1970) (footnote omitted).

Although the interests embraced by the hearsay rule and the Confrontation Clause are

similar, the reach of the two provisions is not conterminous. *Crawford*, 541 U.S. at 51 (noting that

"not all hearsay implicates the Sixth Amendment's core concerns").  "The Confrontation Clause .

. . bars the admission of some evidence that would be otherwise admissible under an exception to

the hearsay rule." *Wright*, 497 U.S. at 814.  Likewise, the Supreme Court has never read the Clause

literally to require the exclusion of all hearsay.  *Ohio v. Roberts*, 448 U.S. 56, 63 (1980) (noting that

to do so would effectuate "a result long rejected as unintended and too extreme"), *overruled by*

*Crawford*, 541 U.S. 36.

In *Ohio v. Roberts*, the Supreme Court likewise viewed the procedural protections of the

Confrontation Clause as a means to an end, and, although re-emphasizing the judicial preference for

face-to-face confrontations, focused on reliability as the touchstone for admissibility of out-of-court

-16-

statements against an accused. "First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. [Generally,] the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* at 65. Second, if a witness is shown to be unavailable, "his statement is admissible only if it bears adequate 'indicia of reliability.'" *Id.* at 66.

The Supreme Court rejected that approach in *Crawford*, declaring that the prior line of cases was flawed because the standard they applied was unpredictable. It criticized conditioning the fulfillment of confrontation rights on the judicial determination of reliability on the grounds that "[r]eliability is an amorphous, if not entirely subjective, concept. There are countless factors bearing on whether a statement is reliable." *Crawford*, 541 U.S. at 63. However, the Court's decision to opt for a clear-cut procedural ultimatum over the *Roberts* balancing test rested on its desire to not "admit core testimonial statements that the Confrontation Clause plainly meant to exclude," and not the prior test's "unpredictability." *See ibid.*

The Court was not satisfied with *Roberts*'s reliance on determinations of reliability in the absence of a concrete procedural safeguard. The Court repeatedly emphasized that the Constitution favors cross-examination as the vehicle for testing a witness's credibility:

> [T]he Clause's ultimate goal is to ensure reliability of evidence, but it is procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined. Cf. 3 Blackstone, Commentaries, at 373 ("This open examination of witnesses . . . is much more conducive to the clearing up of truth"); M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing "beats and bolts out the Truth much better").

*Id.* at 61-62. The prior opportunity to cross-examine, therefore, is a necessary condition for admitting out-of-court statements. *Id.* at 55. The Court described the "evil" against which the Confrontation Clause was meant to protect: "the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 50.

The *Crawford* Court, however, did not require the opportunity for cross-examination to take place at the time of trial. *See id.* at 53-54 (holding that the Confrontation Clause only prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a *prior* opportunity for cross-examination") (emphasis added). And although the Sixth Circuit has expressed some doubt over the admissibility of preliminary hearing testimony of an absent witness under pre-*Crawford* law, *see Vasquez v. Jones*, 496 F.3d 564, 577 (6th Cir. 2007) (stating that "we doubt that the opportunity to question a witness at a preliminary examination hearing satisfies the pre-*Crawford* understanding of the Confrontation Clause's guarantee of 'an opportunity for effective cross-examination' . . . when the witness does not appear at trial") (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)), that point does not appear to be in contention in the present case. The Supreme Court has found no Confrontation Clause violation by the admission of prior testimony of an absent witness when there was an opportunity for cross-examination at the prior proceeding. *Mattox v. United States*, 156 U.S. 237, 244 (1895). Although the prior testimony in *Mattox* was given at the first trial of the case, the Supreme Court has allowed that preliminary hearing testimony may suffice as well. *See Barber v. Page*, 390 U.S. 719, 725-726 (1968) (noting that although the preliminary hearing is ordinarily a less searching exploration into the merits of a case than a trial, "there may be some justification for holding that the opportunity for cross-examination of a witness as a preliminary

hearing satisfies the demand of the confrontation clause where the witness is shown to be actually

unavailable"); *Pointer v. Texas*, 380 U.S. 400, 407 (1965) (finding Confrontation Clause violation

by admission of preliminary hearing testimony, but noting that "[t]he case before us would be quite

a different one had Phillips' statement been taken at a full-fledged hearing at which petitioner had

been represented by counsel who had been given a complete and adequate opportunity to

cross-examine").

     But the petitioner insists that the Confrontation Clause regulates not only the manner in

which prior testimony may be obtained – in a judicial proceeding where the accused has the right

and opportunity for cross-examination – but also the manner in which that prior testimony may be

reproduced at the trial later on.  Although the petitioner cites *Crawford* and *Dutton v. Evans* for this

proposition, his main source of Supreme Court law for this point is *California v. Green*, where the

Court held that a witness's preliminary hearing testimony was admissible, although the witness also

was present at trial.  The Court wrote:

> We also think that Porter's preliminary hearing testimony was admissible as far as
> the Constitution is concerned wholly apart from the question of whether respondent
> had an effective opportunity for confrontation at the subsequent trial.  For Porter's
> statement at the preliminary hearing had already been given under circumstances
> closely approximating those that surround the typical trial.  Porter was under oath;
> respondent was represented by counsel – the same counsel in fact who later
> represented him at the trial; respondent had every opportunity to cross-examine
> Porter as to his statement; *and the proceedings were conducted before a judicial
> tribunal, equipped to provide a judicial record of the hearings*. Under these
> circumstances, Porter's statement would, we think, have been admissible at trial even
> in Porter's absence if Porter had been actually unavailable, despite good-faith efforts
> of the State to produce him.  That being the case, we do not think a different result
> should follow where the witness is actually produced.

*California v. Green*, 399 U.S. 149, 165 (1970) (emphasis added).

The petitioner points to the emphasized language as setting forth a constitutional minimum standard for the admission of former testimony.  The magistrate judge dismissed this language as *dicta*, but it is not readily apparent that such is the case.  *Dictum*, or *obiter dictum*, is "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)."  *United States v. Hardin*, 539 F.3d 404, 439-440 (6th Cir. 2008) (Bachelder, J., dissenting) (quoting *Black's Law Dictionary* (8th ed. 2004).  Since the witness in *Green* was present at the trial, the pronouncement regarding the prior testimony's admissibility had the witness been unavailable is not necessary to the decision.  However, it is not clear that the four-part analysis constitutes *dictum*.  The Court did not address directly which of its two holdings – that Green's confrontation rights were vindicated because the witness was present at trial, and his rights also were satisfied because of the procedures used at the prior hearing – was primary, and which was secondary.  To conclude that the holding that comes first in the opinion is the basis for the decision while the second one is mere *dictum* would be arbitrary.

Nonetheless, the Court does not believe that the Supreme Court intended the four factors set forth in *Green* – oath; prior representation by counsel; opportunity to cross-examine; and proceedings before a judicial tribunal equipped to provide a judicial record – to be the irreducible minimum requirements for prior testimony to pass muster under the Confrontation Clause.  It is more likely that the Court cited those factors in support of its finding that procedures were adequate to ensure reliability – a criterion later rejected by *Crawford*  as a sufficient condition.

In fact, the historical record does not suggest that a verbatim record is a necessary prerequisite for the admission of prior testimony at all, although certainly there is a preference for

it.  In *Toledo Traction Co. v. Cameron*, 137 F. 48, 57-62 (6th Cir. 1905), the court held that prior

testimony of an absent witness was admissible in a civil case.  The court reviewed the body of law

on the subject, citing *Burton v. Driggs*, 87 U.S. (20 Wall.) 125 (1873), in which the plaintiff offered

to prove the contents of a deposition of an absent witness, but which had been lost.  The Supreme

Court found no error, stating:

> 'In *Harper v. Cook*, 1 Car. & Payne, 139, it was held that the contents of a lost
> affidavit might be shown by secondary evidence.  The necessity of re-taking it was
> not suggested.  In the present case the witness lived in another state, and more than
> one hundred miles from the place of trial.  The process of the court could not reach
> him.  For all jurisdictional purposes, he was as if he were dead.'

*Toledo Traction*, 137 F. at 60-61 (quoting *Burton*, 87 U.S. at 134).  The court also cited *Ruch v.*

*Rock Island*, 97 U.S. 693 (1878), in which the Supreme Court approved the admission of an absent

witness's former testimony through the oral evidence of witnesses who heard the deceased witness

testify and had taken notes of it.  Dean Wigmore writes that the preferred manner of preserving an

accused person's statement to an English magistrate was the magistrate's report.  3 Wigmore,

*Evidence* § 1326, at 1616 (1904).  However, when that report was unavailable, secondary evidence

was accepted.  *Id.* § 1327, at 1621 ("[I]f the preferred testimony is unavailable, either because it is

lost or otherwise inaccessible, or because it never existed, the requirement of its use ceases.  The

magistrate's report, then, is not required, and any other testimony to what was said may be used, if

the magistrate's report is lost or otherwise inaccessible, or if it was irregularly taken so as to be

inadmissible, or if it was never taken in writing at all.  But the party wishing to use such other

testimony must show that the preferred testimony is unavailable.").  According to the cases that

preceded present-day technology, "[t]he general rule, in [the case of an absent witness], seems

always to have been to prove the evidence of the deceased witness by some one who heard it on the

former occasion and could testify to the substance of it." *Anderson v. Reid*, 10 App. D.C. 426, 1897 WL 17677, at *3 (D.C. Cir. 1897) (citing 1 Greenleaf Evidence, §§ 155, 156; *Ruch v. Rock Island*, 97 U. S. 693, 694 (1878)).

These cases do not directly impact Confrontation Clause jurisprudence. However, they do demonstrate the acceptance of secondary evidence on occasions where prior testimony is permitted but for some reason was not available in a verbatim record. And they do reflect that acceptance at or near a time when the Sixth Amendment was ratified.

In the petitioner's case, assuming as true the petitioner's claim that no witness could recount the prior cross-examination of Zamen at the preliminary examination, the question whether the petitioner's Confrontation Clause rights were abridged depends on two propositions: 1) the significance and continued viability of the *Green* list of factors, including *Green*'s observation that "the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings;" and 2) the extent to which *Crawford* implicitly demands the preservation of prior cross-examination verbatim.

*Crawford* rejected the "indicia of reliability" test in favor of a more predictable requirement that there be cross-examination. The "four-factor" analysis in *Green* could be read as one application of the analysis that the Court used later in *Roberts* but then rejected entirely in *Crawford*. Under this view, the Court's decision in *Crawford* eviscerates any viability of *Green*'s emphasis on "judicial record," and there is no other Supreme Court case that demands that result. Under another view, however, *Crawford* merely set the floor for admissibility and did not intend to permit a court to admit obviously unreliable testimony, such as testimony that did not meet the criteria laid out in *Green* or otherwise would have failed the *Roberts* test. Both of these positions are plausible.

-22-

However, in order for the writ to issue, the petitioner must establish that the state court's adjudication of his Sixth Amendment claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)).

The Michigan Court of Appeals held that the petitioner's rights under the Confrontation Clause were not violated because he had an opportunity to cross-examine Zamen at the preliminary examination, and, although that court found the secondary witnesses were reliable reporters of the testimony, that court did not read *Crawford* as requiring such a finding. Nor did that court find that *Crawford* or other Supreme Court precedent required that prior testimony be preserved verbatim. As noted above, that is a plausible, if not a desirable, reading of *Crawford*, which, unfortunately for the petitioner, means the resolution by the Michigan Court of Appeals was not unreasonable. *See Bell v. Cone*, 535 U.S. 685, 694 (2002) ("[A] federal habeas court may not issue a writ under the unreasonable application clause simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established Federal law erroneously or incorrectly." (internal quotations omitted)); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) ("the 'unreasonable' requirement is a high bar").

This Court must conclude, therefore, that the procedure used in this case to present the out-of-court statements of Zamen Al-Kasid to the jury did not violate clearly established federal law.

-23-

III.

Although the Court finds that some of the petitioner's procedural objections have merit, their resolution does not change the magistrate judge's ultimate conclusion that the petitioner has not shown that he is presently in custody in violation of the Constitution or the clearly established laws of the United States as determined by the Supreme Court.

Accordingly, it is **ORDERED** that the petitioner's objections to the magistrate judge's report and recommendation [dkt # 30] are **OVERRRULED in part**.

It is further **ORDERED** that the magistrate judge's recommendation [dkt #29] is **ADOPTED**.

It is further **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.


s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  February 17, 2009

<div style="border:1px solid black;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 17, 2009.

s/Felicia M. Moses
FELICIA M. MOSES

</div>

-24-